# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CR-14-231-R |
| | ) | |
| MATTHEW LANE DURHAM, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Defendant has filed a Motion for New Trial pursuant to Federal Rule of Criminal Procedure 33 (Doc. No. 371), to which the United States has filed a response (Doc. No. 381) and Defendant has filed a reply (Doc. No. 403). Thereafter, on October 27, 2015, Defendant filed a Supplement to his Rule 33 motion (Doc. No. 420). Plaintiff responded in opposition thereto (Doc. No. 425) and Defendant filed a reply in support of his supplement (Doc. No. 428). Accordingly, the motion and its supplement are ripe for consideration by the Court. Having considered the parties' submissions, the Court finds as follows.

On August 5, 2014, a federal grand jury returned an indictment against Defendant charging him with violation of 18 U.S.C. § 2423(b), 18 U.S.C. § 2423(c) and 18 U.S.C. § 2241(c).[1] Following the filing of a superseding and then a second superseding indictment, Defendant proceeded to jury trial in June 2015, whereupon he was acquitted on Counts 1 through 9 and Count 12 and convicted on Counts 10-11 and 13-17, each of which charged

---

[1] A complaint had been filed by the government on July 17, 2014, and Defendant was arrested based upon the allegations therein.

a violation of 18 U.S.C. § 2423(c) with a separate victim. Defendant thereafter filed the instant motion as well as a Motion for Judgment of Acquittal and a Motion for Arrest of Judgment.

> In considering a motion for new trial, the court has broad discretion. *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir.1987) (citation omitted). The standards for granting a new trial are not as strict as the standards for granting judgment of acquittal. Federal Rule of Criminal Procedure 33 provides that a court may grant a new trial "if the interest of justice so requires." Additionally, any error that would require reversal may justify a new trial. *United States v. Walters*, 89 F.Supp.2d 1206, 1213 (D.Kan.2000) (citation and quotation marks omitted). The court may weigh the evidence and assess witness credibility. *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir.1999) (citation omitted). A new trial is warranted if, "after weighing the evidence and the credibility of the witnesses, the court determines that 'the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred.'" *United States v. Gabaldon*, 91 F.3d 91, 93–94 (10th Cir.1996) (quoting *United States v. Evans*, 42 F.3d 586, 593 (10th Cir.1994)). But courts disfavor new trials, *United States v. Gleeson*, 411 F.2d 1091, 1093 (10th Cir.1969) (citation omitted), and exercise great caution in granting them, *United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir.1997) (citation omitted).

*United States v. Hohn*, No. 12-20003-03-CM, 2013 WL 6796428, at *2 (D. Kan. Dec. 20, 2013) *aff'd*, 606 F.App'x 902 (10th Cir. 2015) and *aff'd sub nom. United States v. Redifer*, --- Fed.Appx. ---, 2015 WL 7075923 (10th Cir. 2015).[2]

Defendant raises the following arguments in support of his motion: (1) he was deprived of an opportunity to meaningfully investigate, prepare and present a defense; (2) unfair and prejudicial evidence was presented at trial over Defendant's objection and in

---

[2] There are, of course, exceptions to the standard for certain claims. For example, a sufficiency of the evidence challenge, whether pursued under Rule 29 as a motion for judgment of acquittal or a Rule 33 request for new trial are adjudicated under the same standard. *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015).

violation of the Court's prior ruling on a motion *in limine*; (3) evidence presented in support of the counts on which Defendant was acquitted prejudiced him with regard to other counts for which he was convicted; (4) the verdict is contrary to the weight of the evidence; and (5) prosecutorial misconduct in withholding evidence prior to trial and improper comments during closing argument undermines confidence in the jury's verdict. Defendant's supplement raised additional issues regarding prosecutorial misconduct, specifically alleging *Brady*-type violations by the government.

Defendant was arrested on July 17, 2014 on a Criminal Complaint based on alleged criminal activity that occurred in Juja, Kenya, a town approximately 30 kilometers from Nairobi. On July 18, 2014, Defendant made his initial appearance, waived a detention hearing and consented to detention pending further proceedings. Counsel, who had appeared at the July 18, 2014 hearing on Defendant's behalf, entered an appearance on July 31, 2014, the day before a Magistrate Judge conducted a preliminary examination. On August 5, 2014, the grand jury returned the original indictment. The matter was set for trial on the Court's September 2014 docket.

On August 28, 2014, Defendant sought continuation of the trial and the attendant pre-trial deadlines. The Court granted the motion on August 29, 2014, continuing the trial from the September 2014 docket to the Court's March 10, 2015 docket. On November 24, 2014, Defendant filed a Motion to Continue Pretrial Motions Deadline, which the Court granted, extending his deadline for filing motions until December 7, 2014. Thereafter Defendant filed motions asserting a privilege with regard to communications with Kim Kimberling, Ph.D.

and a motion to suppress statements he made to Eunice Menja that he contended were involuntary and thus inadmissible.

On January 20, 2015, the grand jury returned a Superseding Indictment against Defendant. The Superseding Indictment increased the number of counts from 3 to 24, charging eight counts each for violation of 18 U.S.C. §§ 2241(c), 2423(b), and 2423(c). Defendant was charged with violating each of the statutes as to each of the eight alleged victims.

On February 4, 2015, the Court conducted a hearing on the myriad of outstanding motions filed by both parties. The Court granted Defendant's motion to continue the trial, moving the setting to June 2015, and extended the time for disclosures and additional pretrial filings. On April 7, 2015, the Second Superseding Indictment was returned by the grand jury, removing certain counts but retaining seventeen counts under each of the same statutes. As noted, Defendant was convicted on seven counts of the Second Superseding Indictment, leading to the filing of this and other post-trial motions.

Defendant contends he is entitled to a new trial because his ability to conduct adequate pretrial investigation was hampered by the fact that most of the witnesses and evidence were located in Kenya. Because Kenya is not a party to any treaty that would result in legal assistance for Defendant with regard to investigating this case, "Defendant was forced to rely on an impractical letters rogatory process. The letters rogatory process is lengthy, taking **at least a year** to complete." Doc. No. 371, p. 3.

The Court notes that the parties and the Court were aware of the issues related to the extra-territorial nature of this case. The Court granted Defendant's first motion for continuance on August 29, 2014. The motion stated: "[t]hat Defendant needs additional time to prepare for trial due to the logistical complexities of traveling to Kenya to conduct a thorough investigation of the alleged crimes." Doc. No. 30. The Court granted the request.

On January 15, 2015, Defendant filed a Second Motion to Continue, stating therein:

> To further complicate matters, Counsel does not have subpoena power in Kenya. Counsel is forced to rely on the procedures provided by the State Department. It is a long circuitous route to acquire documents and discovery. Unfortunately, Counsel has learned that letters rogatory are traditionally delayed. In an attempt to avoid this route, Counsel has sought, and will continue to seek, discovery from the Government, but has not acquired all of the necessary discovery. Accordingly, Counsel will be filing motions for subpoenas within the coming days, which will invariably use State Department channels. Counsel does not expect responses to be received through State Department channels under after March 2015, or, at best, on the eve of trial.

Doc. 78. At a February 9, 2015 hearing, the Court placed the matter on the June trial docket after Defendant's counsel represented that attorneys for Defendant would be traveling to Kenya and acknowledged the need for letters rogatory. Doc. No. 119, Tr. 125. On May 21, 2015, less than one month before the schedule start of the trial, Defendant filed a Motion for Order for Letters Rogatory. (Doc. No. 218).

> Defendant does not anticipate that these letters rogatory will result in any delay of trial as they are largely tailored to witnesses that the Government has already identified as willing to submit to this Court's jurisdiction and to Kenyan Government agencies that have already been assisting the United States.

Doc. No. 218. Defendant now contends that letters rogatory would have taken at least one year to have completed. Delaying until May 21, 2105 his request that the Court issue letters, prevented determination of how long the process would actually take, because trial was scheduled to begin within three weeks of his request. Furthermore, defense counsel represented to the Court that they traveled to Kenya and conducted an investigation while there, and that Defendant had retained Kenyan counsel, who was permitted to sit with and assist Defendant's primary counsel during the trial. Defendant has failed to proffer or explain what type of evidence he sought but was unable to obtain due to the extraterritorial nature of the prosecution. In light of the above, the Court concludes that Defendant is not entitled to a new trial based on alleged difficulties created by prosecution of the crimes that occurred in Kenya in this jurisdiction.

Defendant also contends the government stonewalled his counsel's investigation and discovery, asserting, in part, that the government attorneys publicly demonized defense counsel. The Court disagrees with Defendant's characterization of the demonization of defense counsel. The discovery issues have been thoroughly addressed throughout this case, and the fact that the government objected to certain of Defendant's requests is not tantamount to obfuscation. Defendant presents no evidence that any person with whom his counsel wished to speak refused to do so because of statements made by the prosecution about

defense counsel or because the prosecution encouraged the person not to speak to defense counsel. Defendant is not entitled to a new trial based on this contention.[3]

Defendant next argues he is entitled to a new trial because the government presented unfair and prejudicial evidence, resulting in an unfair trial. He raises a number of different topics, starting with a contention that the government was improperly permitted to introduce evidence of his sexual orientation, and he contends that "evidence of homosexuality is toxic." Doc. 371, p. 14.[4] Although Defendant contends the evidence was intended to portray him in a negative light and that it prejudiced him, the context in which the evidence was presented leads the Court to conclude otherwise.

The accusations against Defendant began in the evening hours of June 12, 2014. Josphine Wambugu witnessed Defendant laying on a bed with one of the young girls after

---

[3] Defendant contends that he attempted to rectify discovery issues by seeking depositions and subpoenas. Certain of Defendant's motions were granted, *see e.g.* Doc. No. 158, granting Defendant's Motion for Issuance of Rule 17(c) Subpoenas (Doc No. 143), which sought Eunice Menja's employment records from the Oklahoma Department of Human Services. Defendant's Motion for Depositions (Doc. No. 148) was denied because Defendant failed to establish that the Upendo volunteers, who resided in the United States, refused to speak with him because of prosecutorial interference. Furthermore, the motion speculated, without an attempt at proof, that the witnesses might not be available for trial. (Doc. No. 159). The motion cited to one unnamed American witness who indicated she would only be interviewed by the defense if the FBI was present. The motion, however, did not indicate if she was one of the persons Defendant sought to depose. Doc. No. 148, p. 13. The extra-territorial nature of the crime played no role in Defendant's inability to gain access to those persons. Defendant sought financial records related to Upendo from both the United States and Kenya (Doc. No. 157), which was granted by the Court on April 24, 2015 (Doc. No. 160). With regard to Defendant's request for victims' records, Doc. No. 166, the Court modified the request because many of the items requested appeared entirely irrelevant to the issues at hand. *See* Doc. No. 207, p. 17 (Declining to order the production of information regarding religious persuasion, background and home particulars before coming to Upendo, the statutory provision by which the alleged victims are provided accommodations, date and circumstances of absences from the home, visitation logs, statements of special education needs, dietary health needs, etc.). Despite Defendant's protests to the contrary, the Court concludes that it correctly crafted a balance between Defendant's need for relevant discovery and his attempt to conduct a large-scale fishing expedition.

[4] Beyond the evidence in support of the two counts of the Superseding Indictment that charged Defendant with engaging in sexual activity with Kenyan boys there was no evidence of sexual contact between Defendant and other men nor did the government seek to introduce evidence of such.

bedtime; when Matthew saw her, he left. Tr. 92. Ms. Wambugu asked some of the girls what they had been doing with Matthew. Tr. 96. Although the girls initially denied anything inappropriate, one eventually stated they had been doing "bad manners" with Matthew.[5] Tr. 96. Josphine sent a text message to her sister, Eunice Menja, in the early morning hours of June 13, 2014, stating "[m]y dear I cannt (sic) even sleep. Come hear what matt has been doing to my small girls. He is sick need to go back to US. Or he move to other homes." Gov. Ex. 1. The next day Eunice Menja arranged for Defendant to be away from Upendo and the other mission workers while she determined how she would address the situation. Tr. 195. Ultimately, she decided to hold a meeting with Josphine Wambugu, James Mutonga, an employee of the Presbyterian Church of East Africa, Jason Jeffries, an Upendo volunteer, and Defendant, to confront him about the allegations. (Tr. 211). Josphine Wambugu testified that the following transpired:

> When Matthew entered into the room he found us seated. We were in a circle, all of us. And he came - -when he entered inside the room, he said, "You can fire me. You can fire me."

Tr. 106.[6] These statements were made before any questions or statements were made by the others at the meeting. Eunice Menja then told Matthew that she knew he had been hurting girls, and she wanted to hear from him. Tr. 212. Mr. Durham stated he could not remember doing that. Tr. 212. He then asked to speak with Josphine Wambugu outside. Tr. 107, 212. When Defendant implored of Josphine Wambugu to defend him, she indicated she could not

---

[5] Bad manners was defined by Josphine Wambugu as including sexual activity. Tr. 140.

[6] Eunice Menja testified similarly. Tr. 211.

do so because she did not know what he had done. Tr. 108-09. Matthew subsequently stated, "Yes, I did it. Yes, I did." Tr. 109. Josphine Wambugu asked him to go inside and inform the group that he was admitting what he had done. Tr.110. Josphine Wambugu told the group that Defendant had something to say. Tr. 110. However, upon re-entering the room Matthew, rather than making the anticipated admission, stated that he had been struggling with child pornography and homosexuality. Tr. 110.[7] Eunice Menja and Jason Jeffries offered testimony regarding Mr. Durham's statement, which appears an attempt on his behalf to offer an explanation or justification for their accusations and his actions. Tr. 214, 385.[8]

Defendant's objection to any attempt by the government to raise the issue was raised in a motion in limine, Doc. No. 250, which the Court heard at argument on June 3, 2015. The Court stated: "[R]ight now I'm going to overrule it and you can raise it again at the time and I'll look at that case, but it just strikes me, when a defendant is ostensibly explaining what he's done, that that would be very relevant and probative and admissible. So for the time being, I'm going to overrule your objection." Doc. No. 289, Transcript of June 3, 2015 Hearing, p. 78. The government contends Defendant failed to preserve this issue for any

---

[7] The admissibility of Defendant's statements was the subject of more than one Motion in Limine by Defendant and objection at trial. The Court offered a limiting instruction which Defendant's counsel rejected, stating "I don't see how there can be any limiting instruction that cures its prejudice." Tr. 112. Defendant now contends the Court must have recognized the "grave risk of prejudice" because it offered a limiting instruction. Certainly the Court was aware of the risk of prejudice, however, Defendant overstates the Court's concerns. The offer was in light of Defendant's repeated objection to introduction of his statements.

[8] Defendant's testimony regarding the meeting differs from that of the other witnesses. He testified that he happened upon a meeting when he went to check on his phone, which was charging, and that he believed he would be joining a discussion about Nick, an Upendo employee with performance issues. Tr. 1217-18. He testified that Eunice Menja then informed him that he had reports of inappropriate behavior and that Mr. Jeffries said six children say you have been sexually molesting them. Tr. 1220. He contends he went outside with Josphine Wambugu because she said she thought he would be more comfortable speaking with her alone Tr. 1226. He testified that when he returned he stated that he had struggled with homosexuality before, but denied mentioning child pornography. Tr. 1234.

consideration other than plain error review, because he did not renew his objection at trial. Having reviewed the trial transcript the Court disagrees with the government's contention that Defendant did not preserve his objection by renewing his opposition at trial.

"May I renew my objection at this time based upon the papers previously submitted to the Court?" Tr. 108. The Court understood, then and now, this to be Defendant's objection to any testimony about his comments to Josphine Wambugu and the others about his purported struggles. Accordingly, the Court declines the government's invitation to rely on the plain error standard. Regardless, the Court finds that Defendant is not entitled to a new trial based on the admission of his statements during the June 13, 2014 meeting at Upendo.

The issue presented at trial for the jury was not whether Defendant is homosexual. Rather, when confronted with the allegations that he had molested children, Defendant proffered what was perhaps intended, on his part, to be an explanation for his behavior. He then proceeded not to deny inappropriate contact with the children, stating that he was unable to recall engaging in the behavior. The United States never argued that Defendant engaged in sexual activity with the children because he is homosexual, rather the prosecution noted in closing argument that when confronted, he proffered an excuse. Tr. 1437.

The Court finds now, as it did previously, that the potential prejudice of admitting Defendant's statements did not outweigh their probative value. The government did not argue that Defendant is homosexual and as a result committed the alleged crimes. The Court finds that despite the potential for prejudice to Defendant, that the evidence herein was relevant, largely because it was offered by Defendant as some type of explanation or justification

when he was accused of engaging in inappropriate sexual activity with children at Upendo. Tr. 1477.

Defendant further contends he is entitled to a new trial because the Court erred in permitting the government to introduce his alleged statement from that same June 13, 2014 meeting, that he "struggled with child pornography." Tr. 110. Defendant rejected a limiting statement, as set forth above. Tr. 111. Furthermore, he turned absence of any evidence of child pornography into an argument during closing.

> And, ladies and gentlemen, whoever heard of a 19-year-old pedophile, if that's what he is, and yet with his alleged interest in child pornography, indeed, his struggle with child pornography, there isn't a single example of child pornography on his Internet, on his computer, on his Kenya phone, and on his American phone, and the search from his house. It's not here.

Tr. 1455. Again, as with the references to homosexuality, the case was not about child pornography, the government did not accuse Defendant of possessing or watching child pornography. Rather, witnesses testified that during a meeting intended to confront Defendant about his alleged sexual activity with certain of the children he offered this explanation for his actions. The statement was relevant because it was offered by Defendant as a justification for the behavior of which he was accused. In neither case did the prejudicial value outweigh the probative value of the evidence. Accordingly, Defendant is not entitled to a new trial on this basis.

Defendant next argues that inadmissible character evidence was introduced via the testimony of Ashlyn Rudy. On direct by the Government, the following exchange occurred:

Q:      When you learned about it [the allegations against Defendant],
        were you shocked?
A:      Yes.
Q:      Was that the Matthew Durham that you knew?
A:      Wouldn't necessarily say I would expect Matt to do those things,
        but I wasn't necessarily surprised.

Tr. 681-82. No objection was made to the testimony. Defendant contends this was improper

character evidence and inadmissible pursuant to Rule 404(a) of the Federal Rules of

Evidence, which provides "[e]vidence of a person's character or character trait is not

admissible to prove that on a particular occasion the person acted in accordance with the

character or trait."

In response, citing the exception set forth in Rule 404(a)(2)(A) of the Federal Rules

of Evidence, the government contends Defendant opened the door to such questions by

making inquiry of other witnesses about Defendant's good character, specifically through

cross-examination of Emily Coatney.

"[A] defendant may offer evidence of the defendant's pertinent trait, and if the

evidence is admitted, the prosecutor may offer evidence to rebut it." Fed.R.Evid.

404(a)(2)(A). The Court disagrees that Defendant opened the door by introducing character

evidence, because Ms. Coatney was not Defendant's witness. The rule applies "[o]nce

evidence of defendant's character is offered by defendant (either through defendant or a

defense witness), the government may counter that evidence on cross-examination by

referencing relevant specific instances of conduct [under Rule 405(a)]". *United States v.*

*Seymour*, 598 Fed.Appx. 867 (10th Cir. Mar. 27, 2015)(quoting *United States v. McHorse*,

179 F.3d 889, 901–02 (10th Cir.1999)). The Court finds, however, that in light of the absence of any objection by Defendant to the question or response, that review is limited to consideration of whether it was plain error.

"Plain error occurs when there is (1) error, (2) that is plain, which (3) affects [the defendant's] substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Caraway*, 534 F.3d 1290, 1298 (10th Cir. 2008) (internal quotation marks omitted) Defendant bears the burden of establishing all four elements of plain error. *See United States v. Gonzales*, 558 F.3d 1193, 1199 (10th Cir.2009). Defendant has failed to establish that the single question posed to Ms. Rudy at the end of her testimony constituted plain error, as defined above. As such, the Court declines Defendant's invitation to conclude that he was deprived of a fair trial as a result of the question, and this ground for relief is hereby denied.

Citing to Rule 611(c) of the Federal Rules of Evidence, Defendant contends the prosecution engaged in misconduct by utilizing leading questions with the child witnesses. Defendant does not cite to any particular questions that in retrospect were objectionable, and no contemporaneous objections were made during the children's testimony. As such, the Court again confines its review to plain error analysis.

Rule 611(c) of the Federal Rules of Evidence provides: "(c) Leading Questions. Leading questions should not be used on direct examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions: (1) on cross-examination; and (2) when a party calls a hostile witness, an adverse party, or a witness

identified with an adverse party." Fed.R.Evid. 611(c). The Advisory Committee Notes indicate, however, that leading questions may be appropriate when a child is offering testimony. The Tenth Circuit in *United States v. Tome*, 3 F.3d 342, (10th Cir. 1993), concluded that the Court's decision to permit the government to use leading questions on the direct examination of a victim of abuse was not an abuse of discretion.

> Fed.R.Evid. 611(c) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." This circuit has long recognized the necessity of using leading questions to elicit testimony from child sex abuse victims. *See Antelope v. United States*, 185 F.2d 174, 175 (10th Cir.1950). Indeed, the Advisory Committee Notes to Rule 611(c) expressly identify the examination of child witnesses as an exception to the general prohibition on the use of leading questions during direct examination. Fed.R.Evid. 611(c) advisory committee's note; see also *United States v. Castro–Romero*, 964 F.2d 942, 943–44 (9th Cir.1992) (leading question used during direct examination of 8–year–old sex abuse victim).

*United States v. Toro–Pelaez*, 3 F.3d 342, 353 (10th Cir.1997), *reversed on other grounds*, 513 U.S. 150 (1995). Accordingly, Defendant's argument that use of leading questions by the prosecution with regard to the children witnesses mandates a new trial is without merit.

Defendant next argues the Government improperly referenced his counseling sessions at trial, which invited improper speculation because the contents of such sessions were privileged. Defendant cites to three examples in the trial, two of which did not draw objections from defense counsel. *See* Tr. 697 ("You took him to see a counselor?"); Tr. 717 ("and you mentioned that you took him to a counselor?"). Defendant also complains about the government use at trial of a text message he sent to a friend indicating he was looking

into mental health treatment. This evidence drew an objection by defense counsel. Tr. 488 and Tr. 1324.

Prior to trial the Court concluded that the counseling records of Dr. Kim Kimberling were privileged and therefore inadmissible. The Court, however, did not preclude all inquiry into the issue of counseling and whether Defendant represented to persons that he intended to seek counseling or mental health treatment.[9] Defendant argues that inquiring of Kyle Durham whether he took Defendant to counseling left the jury with unanswered questions, because those questions inevitably would have led to an area where the Court had specifically precluded inquiry, Dr. Kimberling. *See* Tr. 697, 717. The Court first notes that the record contains other testimony referencing Defendant's alleged intent to seek counseling when he returned from Kenya or attending counseling, about which Defendant makes no mention in the instant motion. See e.g. Tr. 332; 475. Additionally, Defendant did not make a contemporaneous objection to the questions posed to his father, thereby limiting the Court's review to plain error as defined above. Although the questions about counseling posed to Defendant's father were not ideal, they provide no basis for a new trial in light of the testimony about which Defendant makes no objection and further, in light of Defendant's statements sent via text message that he intended to seek out mental health treatment, as set forth below.

---

[9] Defendant correctly notes that at the June 3, 2015 hearing the Court stated: "I tell you what, before you offer that, bring that to my attention," referencing the government's intent to utilize the text messages Defendant sent stating he intended to seek counseling. Doc. No. 289, Tr. 33-34. To the extent the discussion at the June 3, 2015 hearing could be considered as addressing any inquiries into whether Defendant received counseling, i.e. the questions posed to to Kyle Durham at trial, the Court concludes that the government's failure to bring the issue to the Court's attention was harmless in light of Defendant's failure to object to the questions.

As noted, a contemporaneous objection was made to introduction of a text message Defendant sent on June 14, 2014.[10] Regardless, the Court concludes the government did not err in seeking its admission, nor did the evidence verge on violating the Court's ban on introduction of the records of Dr. Kimberling. Defendant authored the text while he was still in Kenya and sent it to Rilee Spence.

> I have not a single thread of memory of anything occurring. I explained everything to my parents and they talked to a psychologist[ ] and he also suspects I suffer from Dissociative Personality Disorder. . . . I'm looking into mental health care facilities that can hopefully help me overcome this problem.
> . . .

Gov. Ex. 13, Ex. 29, block 13. Contrary to this message, Defendant conceded at trial that no doctor had been consulted on his behalf or a tentative diagnosis offered. Tr. 1318-19. He testified there was a miscommunication with his parents, and that he must have mis-worded his statement to Rilee Spence. Tr. 1319. Defendant further testified that he used Google to search "Multiple Personality Disorder" which sent him to dissociated personality disorder. Tr. 1323. Defendant also admitted that he had never Googled mental health care facilities, despite his statement that he was looking into treatment facilities. Tr. 1327. Finally, the testimony offered by Defendant's father, Kyle Durham, was that he never spoke to a psychologist on Defendant's behalf. Tr. 722. *See also* Tr. 1097 (Testimony of Melissa Durham denying that anyone told her that Defendant suffered from dissociative personality disorder before his return from Kenya). In short, nothing about the text message touched

---

[10] Defendant first objected to introduction of the text, Ex. 13, as hearsay. Tr. 488. During Defendant's testimony counsel objected on the basis that the exhibit, Ex. 29, block 13, was an attempt to bootstrap a mental health defense, which he was not raising. Tr. 1325. The same text message appeared in both exhibits.

upon, in any manner, Dr. Kimberling or his records. Rather, it was Defendant making false statements, either inadvertently or purposefully, but none of which touched upon any forbidden topic. In light of the evidence that Defendant never researched or sought a treatment facility and his admission that no psychologist was consulted or tentative diagnosis offered by such person, his statements about his intention to seek treatment could be construed as admissions. Nothing about introduction of these exhibits and the attendant testimony was in any manner improper, because it did not implicate the counseling that was the subject of the Court's pre-trial ruling.

Defendant next argues that the evidence used to support those convictions for which Defendant was acquitted, specifically Counts 1 through 9 and Count 12, infected the trial on the counts of conviction. He contends that evidence relevant to Counts 1 through 9, that was not relevant to the counts on which the jury convicted him, spilled over and tainted the jury's consideration of the remaining counts, entitling him to a new trial. Specifically he complains about the (1) testimony that he struggled with homosexuality; (2) the testimony that Defendant stated he struggled with child pornography; (3) text message evidence referring to psychological treatment; and (4) the alleged improper character evidence from Ms. Rudy. The Court concluded above that none of this evidence was sufficient to establish Defendant was entitled to a new trial. The Court further finds that the fact that he was acquitted on the charges that required the government to prove that he traveled with the intent to engage in sexual conduct with a person under the age of twelve or between the ages of twelve and sixteen, did not render the above evidence irrelevant to the remaining counts so as to cause

concerns regarding spillover. The very fact of Defendant's acquittal on these counts refutes the suggestion of prejudice.

In support of this proposition Defendant relies on *United States v. Hamilton*, 334 F.3d 170, 182 (2d Cir. 2003). Therein the court cited and discussed at length Second Circuit precedent on the issue, which make it clear that Defendant is not entitled to a new trial on this basis.

> The concept of prejudicial spillover ... requires an assessment of the likelihood that the jury, in considering one particular count . . . was affected by evidence that was relevant only to a different count.

*Id.* at 182. The court reiterated its three-part test for assessing the likelihood of prejudicial spillover.

> [W]e have articulated a three-part test for determining whether there was likely prejudicial spillover from the evidence submitted in support of convictions that were set aside after trial. We consider (1) whether the evidence introduced in support of the vacated count "was of such an inflammatory nature that it would have tended to incite or arouse the jury into convicting the defendant on the remaining counts," (2) whether the dismissed count and the remaining counts were similar, and (3) whether the government's evidence on the remaining counts was weak or strong. *[United States v. Vebeliunas*, 76 F.3d [1283,] 1294 (internal quotation marks omitted); *see United States v. Wapnick*, 60 F.3d 948, 953-54 (2d Cir.1995), *cert. denied*, 517 U.S. 1187, 116 S.Ct. 1672, 134 L.Ed.2d 776 (1996); *United States v. Rooney*, 37 F.3d 847, 855-56 (2d Cir.1994).

*Id.* Assuming the Tenth Circuit would embrace this test under the factual circumstance of this case, that is where a defendant is acquitted by jury on some counts and convicted on others,

the Court finds that Defendant is not entitled to relief.[11] First, the evidence submitted in support of the counts on which Defendant was acquitted was not inflammatory. Second, the counts were very similar, the travel with intent providing the difference between the counts, which weighs against finding prejudicial spillover. *Id.* Finally, the strength of the evidence on the counts for which Defendant was convicted weighs against a finding of spillover.

Furthermore, the jury was instructed to consider each offense, and the evidence related to each offense, separately. Instruction No. 20 included the following:

> You must separately consider the evidence that relates to each offense, and you must return a verdict for each offense. For each offense charged, you much decide whether the Government has proved beyond a reasonable doubt that the Defendant is guilty of that particular offense.
> Your decision on one offense, whether guilty or not guilty, should not influence your decision on any of the other offenses charged. Each offense should be separately considered.

Doc. No. 329, p. 29. The Court presumes the jury followed the instructions given. *See CSX Transportation, Inc. v. Hensley*, 556 U.S. 838, 841 (2009)( "juries are presumed to follow the court's instructions"). As such, the Court finds that Defendant has not established that he is entitled to a new trial on the grounds that evidence improperly spilled over from the acquitted charges to the remaining counts.

Defendant contends he is entitled to a new trial because the verdict was contrary to the weight of the evidence. This Court is free to weigh the evidence and assess the credibility

---

[11] The cases from the Second Circuit generally involved post-judgment acquittal. *See United States v. Hamilton*, 334 F.3d at 183 ("In contrast, where the record indicates that the jury was able to distinguish between counts or between defendants, and to assess separately the evidence pertinent to each, we have found no basis for concluding that a new trial was warranted because of prejudicial spillover. The absence of such spillover is more readily inferable where the jury has convicted a defendant on some counts but not on others." *Id.* (citations omitted).

of the witnesses in considering Defendant's Rule 33 Motion. *See United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1994)(citing *Tibbs v. Florida*, 457 U.S. 31, 37–38 & n. 11, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982)); *see also United States v. Gabaldon*, 91 F.3d 91, 93 (10th Cir. 1996). The Court has contemporaneously herewith held the evidence sufficient to sustain the verdicts with regard to Counts 10, and 15 through 17, and thus Defendant's incorporation of his arguments from his motion for judgment of acquittal are not well taken. As noted by the Tenth Circuit in *United States v. Cesareo-Ayala*, 576 F.3d 1120, 1126 (10th Cir. 2009) "we doubt that we could ever find an abuse of discretion by the district court in denying a new-trial motion based on the weight of the evidence when the evidence was sufficient to support the verdict. We note that courts of appeals routinely affirm the denial of such new-trial motions once they have upheld the sufficiency of the evidence." (Citing *United States v. Rodriguez*, 457 F.3d 109, 118-19 (1st Cir.2006); *United States v. Bullock*, 550 F.3d 247, 251 (2d Cir.2008); *United States v. LeGrand*, 468 F.3d 1077, 1080 (8th Cir.2006); *United States v. Hunt*, 526 F.3d 739, 744 n. 1 (11th Cir.2008)). Furthermore, Defendant's contentions notwithstanding, the Court has reviewed the evidence, including exhibits and the transcripts herein, and finds no basis for concluding that the verdict is contrary to the weight of the evidence. This is especially true in light of Defendant's multiple confessions, albeit under unusual circumstances, as well as the testimony of the victims and other government evidence which the Court finds was credible. The Court does not perceive that the jury improperly weighed the evidence, *see Cesareo-Ayala*, 576 F.3d at 1126, such that a miscarriage of justice occurred, and thus Defendant is not entitled to a new trial on this

basis. Defendant next contends that the government failed to prove jurisdiction, incorporating the arguments contained in his Rule 34 motion. Defendant argues that a new trial is necessary because the government failed to establish how Defendant's alleged acts in Kenya related to foreign commerce or the commerce clause. There was evidence that Defendant initiated his trip in Oklahoma City and flew to Nairobi on a ticket purchased by an agent who regularly arranged trips for Upendo volunteers. Tr. 177. He traveled from the United States to Nairobi via Europe, most likely through Brussels. Tr. 178. Accordingly, the Court has no difficulty in finding that Defendant traveled in foreign commerce sufficient to support his conviction under 18 U.S.C. § 2423(c).

Defendant next contends the government withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150, 154 (1972). To establish a *Brady* violation, the defendant must prove that the prosecution suppressed evidence, the evidence was favorable to the defense, and the evidence was material. *See United States v. DeLuna*, 10 F.3d 1529, 1534 (10th Cir.1993).

In Defendant's first *Brady* claim he contends the government suppressed video data of his conversation with Eunice Menja, wherein he confessed to certain of the allegations against him. Referencing his prior motions regarding the cell phone, Defendant argues, "[i]n summation, the cell-phone videos appeared plainly edited." Doc. No. 371, p. 24. Although Defendant argues to the contrary, he lacks evidence that the government failed to provide him with exculpatory evidence from Eunice Menja's cellular telephone. Defendant indicated he was calling an expert to testify that the videos of Defendant's confession were altered; but

ultimately he presented no such evidence nor did he provide the Court with a proffer. The government, upon order of the Court, provided, Defendant's expert with access to what defense counsel referenced as a "forensic copy." Tr. 1022.[12] The Court anticipated testimony from Donovan Farrow, who Defendant represented was an expert who would testify about cell phone information. Tr. 1020. The objection by government's counsel was that Mr. Farrow was going to testify about alleged alterations to videos that had not been offered as exhibits by the government, and that Defendant had not offered.

| | |
|---|---|
| The Court: | What I understand your objection is you have offered certain videos and you are wanting to show that those videos have been altered. |
| Ms. Panter: | We're not going to play any videos. |
| The Court: | Are you wanting to show that the videos that they have shown have been altered? |
| Ms. Panter: | As far as a few select videos. |
| Mr. Creager: | The five video files that have been entered, not the underscore 001, not the underscore 002, LVL files. |
| Ms. Panter: | The underscore 001 and underscore 002 and those are not yet admitted. |
| Mr. Creager: | Neither of those have been admitted. There's not been any testimony about where those came from, whether they fairly and accurately represent anything. There's no testimony about where they came from whatsoever, so its basically -- |
| The Court: | Are you saying they don't necessarily have any relevance to the case? |
| Mr. Creager: | Correct, Your Honor. |

---

[12] Counsel for Defendant stated:

That's the information, the metadata that he was able to obtain from the videos we have been provided. I am not sure all the videos that have been entered because I haven't been in court every second, so if they haven't been, we can enter them, but I do not have then available at this time, or we can actually withdraw that exhibit and not use it in front of the jury and just enter the exhibit that he obtained from the forensic copy that they have.

Tr. 1022.

| Ms. Panter: | Well, except for Ms. Menja testifying previously that she gave her phone and the videos to the FBI and they selected the videos that they wanted from the phone, which would include these five and the underscore 001 and 002, because we have been provided them in discovery. |
| Mr. Creager: | But they're not before the jury. |
| Ms. Panter: | Well, how about if we call a different witness and we enter --- we'll prepare those videos to be entered tomorrow morning. |

Tr. 1022-1024. Defendant's counsel made no further mention of Mr. Farrow or of underscore 001 or underscore 002 at trial. Despite Defendant's contention that it was apparent that the videos were altered, he has provided no evidence or record citation in support of this contention. Defendant has offered no evidence that he made exculpatory statements that were omitted from the videos either because Eunice Menja did not video such statements or because the videos were altered. As such, Defendant has failed to establish a *Brady* violation on this ground and is not entitled to a new trial on this basis.[13]

Defendant further contends he is entitled to a new trial because the prosecutor's closing argument was improper. The prosecution may not misstate the evidence during its closing argument. *United States v. Young*, 470 U.S. 1, 9 & n. 7, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). However, the Tenth Circuit has "often held that a stray improper remark in closing is no basis for upsetting a trial and requiring the parties and the district court to redo their ordeal." *United States v. Lopez–Medina*, 596 F.3d 716, 740 (10th Cir.2010) (*quoting*

---

[13] Defendant concedes that he lacks "scientific evidence" that the videos were altered. Doc. No. 371, p.25. Accordingly, it would appear that this argument is not truly a *Brady* claim, because Defendant cannot meet the threshold of showing that the government failed to provide him with exculpatory evidence.

*Whittenburg v. Werner Enters., Inc.*, 561 F.3d 1122, 1131 (10th Cir.2009)). In assessing allegations of prosecutorial misconduct with regard to closing argument to which no objection is made, the Court's review is limited to plain error *United States v. Fleming*, 667 F.3d 1098, 1103 (10th Cir. 2011). The alleged improper remarks must be viewed in the context of the entire trial. *Id.* Finally, a two-part test is applied to determine whether a statement constituted prosecutorial misconduct. *Id.* The Court must first determine whether the prosecutor's statements were improper, and if so, whether the statements were harmless beyond a reasonable doubt. *Id.* Defendant's failure to object shifts the burden to Defendant, "who bears the burden of persuasion with respect to prejudice." *Id.* (quoting *United States v. Solon*, 596 F.3d 1206, 1212 (10th Cir. 2010)(quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)).[14]

Defendant contends the government mis-characterized the testimony of Defendant's mother in the rebuttal portion of the government's closing argument. Defendant complains about the following:

> And yet she testifies that she said write down whatever you're going to write down. . . Mrs. Durham is trying to tell you somehow that she knew that a conversation that hadn't taken place, Matthew Durham saying - you heard Eunice Menja testify - write it down, I can't hear anymore, you write it down. That does not happen until after the phone call.

Tr. 1478. Defendant contends the United States falsely labeled Mrs. Durham a liar and that it was an attempt to mislead the jury. The discrepancy with Mrs. Durham's actual testimony

---

[14] Generally the government bears the burden of establishing that an improper statement is harmless beyond a reasonable doubt.

is that she testified "I told him to say whatever he needed to say and to whatever Eunice Menja told him to do. That was my only advice." Tr. 1095.

Defendant contends the prosecution falsely labeled Mrs. Durham a liar, arguing that the falsity of the representation was so blatant that it must have been intended to mislead the jury. First. Kyle Durham testified that he overheard his wife "tell him to say whatever Eunice wanted him to say and to write down whatever names she said." Tr. 1159. Furthermore, from the Court's perspective, the government's argument was difficult to follow, especially in light of the conflict between the testimony of Eunice Menja, that the confession had been given and written before the phone call was made, and Defendant, who testified that he called his mother before he wrote the written confessions, but after the videos, which includes portions of Defendant's confession, but not any writings. Tr. 1280-81. Accordingly, even if it were prosecutorial misconduct, "[p]rosecutorial misconduct is considered harmless 'unless there is reason to believe it influenced the jury's verdict.'" *United States v. Green*, 435 F.3d 1265, 1268 (10th Cir.2006) (*quoting United States v. Gabaldon*, 91 F.3d 91, 94 (10th Cir.1996)). The Court is confident that this relatively minor statement neither affected Defendant's substantial rights nor the outcome of his case and thus does not entitle him to a new trial.

Plaintiff's next complaint again focuses on the rebuttal portion of the government's closing argument, which he contends misinformed the jurors regarding what inferences could properly be drawn from the evidence:

> And then he says, "Like I told you, I've struggled with touching children all my life and with being with other men." Where else did he tell her that? Wambugu, Menja, Mutonga, Jeffries, all testified on June 13th, when he talked

to Josphine Wambugu, he came back and the excuse he gave for hurting children -- there's no names mentioned. He mentioned a few names. No one else testified that names are given. They purposely didn't tell him who the kids were. They wanted to hear it for themselves.

***

Ladies and gentleman, that's telling, because in four minutes into Government's Exhibit 4, he learns for the first time that the kids that have come forward aren't boys, like he thought, but girls. Watch his reaction to Selina, Lydia, Sandra, and Susan. He blew it. His cover fails. He thought it was Little John, who he raped, molested, on the 11th and the 12th of June, that betrayed him, that went out and told.

***

That's why on June 13th he mentions homosexuality. If he thought it was girls, if he knew girls' names, why would he ever give homosexuality as a reason as to why he might have done what he did.

Tr. 1446-47. Defendant contends the prosecution mis-characterized the evidence because he was not the sole witness to testify that names were used to identify alleged victims on June 13, 2014, when Defendant was first confronted with the accusations. Defendant cites to James Mutonga testified that names were given.[15] The only evidence to which Defendant points, that offered by Mr. Mutonga, although inconsistent with the statement in closing that names were not mentioned, the import of the inference was whether victims had been identified by gender.[16] Mr. Mutonga's testimony does not allow the Court to discern whether

---

[15] Mr. Mutonga indicated names were given, however he was unable to name any names and was not asked if the victims whose names were given were male or female. Tr. 550.

[16] Defendant's trial testimony on the issue is difficult to follow. There is no dispute that Defendant made the statement about struggling with homosexuality when he and Josphine Wambugu returned from their private conversation outside. When asked by counsel if, at the time he made that statement, he knew they were talking about girls, he stated, "I don't think so, no." However, the following contrary exchange occurred

(continued...)

the names of boys or girls were given. As such, the Court is unable to conclude that any error by the prosecution was sufficient to warrant a new trial because it rendered Defendant's trial fundamentally unfair.

Defendant next argues:

> As discussed in Section II, *supra*, the Government presented prejudicial evidence and testimony in closing argument regarding (1) Defendant's sexual orientation, (2) Defendant's use of child pornography, (3) the Defendant's alleged bad character, (4) in the form of leading questions, and (5) Defendant's counseling sessions. This impermissible evidence, coupled with the Government's gross misstatements of the evidence in its closing argument, substantially prejudiced the Defendant and resulted in an unfair trial and denial of due process.

Doc. No. 371, p. 29. Defendant does not cite to any portion of the closing argument or particular language thereof in support of this claim, and having found no error with regard to introduction of the identified evidence, the Court finds no error in reference thereto in closing argument. Defendant is not entitled to a new trial on this basis.

---

[16](...continued)
next.

| Q: | All right. They has said "children"? |
| A: | Yes. |
| Q: | When, if any, during that meeting, did the conversation turn to girls, if it did? |
| A: | I just know that Jason mentioned one time that I had been accused of raping [retracted]. I think he might have said [retracted's] name, but I don't remember. |
| Q: | And when he told you that, what did you say to him? |
| A: | It was earlier in the meeting, so I said no. |
| Q: | That was before you and Josphine went out? |
| A: | Yes, sir. |

Tr. 1233. Defendant testified on cross-examination about two names, both female, that he remembered were mentioned on June 13, 2014, although there is no indication of whether the names were mentioned before or after his statement about his alleged struggles. Tr. 1383.

As noted above, on October 27, 2015, Defendant filed a supplement to his Rule 33 Motion for New Trial. Therein he raises two legal arguments stemming from information he obtained, from the Court following trial. On September 28, 2015, the Court sent a letter to counsel for both Plaintiff and Defendant, including therewith two Memoranda, which had been provided to the Court by David Prater, Oklahoma County District Attorney. The first is dated August 16, 2015, and is not signed and contains no identifying information, but was apparently prepared by an assistant district attorney whose identity the parties do not dispute. Therein the attorney states that he has concerns regarding conversations between himself and Mr. Gifford, one of the prosecutors in this case. Specifically, on the date the government rested it case-in-chief Mr. Gifford contacted the assistant district attorney and they discussed the facts of this case.

> I asked Gifford about the facts of his case. He said there were 5 or 6 or 7 (don't remember the exact number) of female victims ages 6 to 14. All but one of them had a perforated hymen. He indicated this evidence was presented by the government's medical witness. . . . A reviewing doctor actually testified to the perforated hymens. He said as best as they could tell, the sexual assault exams were done about 6 weeks after the abuse occurred. He said the defense was calling a sexual assault expert, and he did not know what the expert would say. . . . I told him that I have not heard the term perforated hymen. I told him it is very unusual to have physical findings in children; that it is extremely unusual and almost unheard of to have physical findings in 5 of 6 or 6 of 7 victims. I called Donaldson [a PA at CHO] and joined her for a three-way conversation with Gifford. She told him the same things. We together told him that there are legitimate medical studies showing even pregnant girls have normal exams. Donaldson explained the anatomy and that there are legitimate medical studies showing that even pregnant girls have normal exams. . . . I expressed my opinion to him that [] he cannot cross examine the defense expert in good faith on those issues, because medical research and the legitimate medical community share those opinions. I encouraged him to instead contact Dr.

Brown to be a rebuttal witness to use to say even if the African exams are incorrect, it still does not mean sexual abuse did not occur.

Doc. No. 420-2.[17] Ryan Brown, M.D., provided a memorandum to the assistant district attorney which was presented to the Court by Mr. Prater regarding his discussions with Mr. Gifford.

> We discussed what a performed hymen meant to me. I had told him that to me, it meant that the hymen had a hole in it, which is normal. I didn't know if that was what the African physician had meant by it, but we don't normally use that language to describe hymens here in the US. . . . I had also stated that an imperforate hymen, is still normal, but is actually not a common finding. He had stated to me that the African physician had stated that he had found 5 of the 6 young ladies in the case to have perforated hymens and that the physician was calling that an abnormal finding. I spoke with him that actually it is rare to have findings in sexual abuse exams, especially in your preadolescent children. I told him that about 95% of the time we will have a normal finding, and of the 5%, 2/3 of the evidence is found on the clothing or bed. I also reiterated that a normal exam does not rule in or rule out a sexual encounter. Also, that it would be quite rare for 5 individuals to have the same findings on exam in regards to a sexual assault, unless the perpetrator was using some type of instrumentation, I also spoke about how quickly findings on exams can heal, IF there were findings to begin with. . . . Again I stated that it would be a small chance to have abnormal findings on a preadolescent sexual abuse exam, and to have multiple children with the same finding, other than normal, would be rare. I also stated again that time is of the essence and rape exams done after a week could be normal even if there was a finding to begin with since the tissue heals so quickly.

---

[17] A substantial portion of the statement from the assistant district attorney addresses the alleged failure of the United States, via the United States Attorney and the Assistant United States Attorney prosecuting this case, to respond to his concerns. The Court need not address the allegations by the Assistant District Attorney regarding his conversations with the federal prosecutor or the conversations the District Attorney allegedly had with the United States Attorney for the Western District of Oklahoma, because the basis for any nondisclosure by the government is not relevant under *Brady* and its progeny. "If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976).

Doc. No. 420-3. Defendant contends that these two statements support claims under *Napue v. Illinois*, 360 U.S. 264 (1959), as well as *Brady v. Maryland*, when considered in comparison to the testimony of Dr. Alawiya Abdulkadir Mohamed, who testified on behalf of the government.[18] Dr. Abdulkadir did not examine the alleged victims, but testified based on a Medical Examination Report, which she completed based off of the Post Rape Care "PRC" Forms completed by Dr. Peter Wanjohi, which is the protocol in Kenya. Tr. 563, 568-69, 574, 598-99. Her testimony included the following:

> Q:    [C]an you explain to the jury what the hymen is on a female?
> A:    Okay. So the hymen is a membrane which covers the vagina and it's -- it doesn't fully cover the vagina, so there's a portion which is slightly open to allow the menstrual flow. So it's a membrane which is usually most people get born with it and it's usually present in kids and -- yes,
> Q:    If a hymen is perforated, what does that mean?
> A:    Okay. We -- the hymen could be perforated due to several reasons. One of them would be due to sexual assault. The others would be due to extraneous exercises involving the groin region or falling astride, like falling on a wall, having bicycle accidents and horseback riding. Those are the common things which break the hymen.

Tr. 571-72. She further testified that a perforated hymen on girls the age of the victims would not be normal. Tr. 54-75. On cross-examination Dr. Abdulkadir testified:

> Q:    Now, you talked a lot about a perforated hymen?
> A:    Yes.
> Q:    Now, a hymen -- a hymen can be in very different shapes; is that right?
> A.    True.

_____

[18] Defendant references the doctor as Dr. Mohamed, the government calls her Dr. Abdulkadir. At trial she testified that she preferred to be called Dr. Abdulkadir. Accordingly, the Court will reference her by this name.

Q. It can be flat; is that right?

A. Yes.

Q. It can be round, some are bigger and some are smaller?

A. Bigger in terms of?

Q. Of their size. Some women will have a bigger hymen than others?

A. It's a membrane, so it's more thickness than bigger, it's not --

Q. More thickness?

A. The dimensions are not three-dimensional.

Q. If a woman has not started menstruating yet, would her hymen -- it's called non-estrogenized; is that right?

A. Yes.

Q. And that means that the hymen is more rigid and hard?

A. Yes.

Q. And so that would be the situation for children who have not yet hit their menstrual cycle; is that right?

A. Yes.

Tr. 584-85; *see also* Tr. 607 (answering in the negative when asked if 7, 6, 13 or 11 year old should have a perforated hymen). She agreed with defense counsel when asked if every hymen has an opening and whether the openings could be different shapes, such as a crescent moon, a dot, or a poked through hole. Tr. 585-86. She testified that despite approximating that the assaults occurred one month prior to the June 18, 2014 examinations, that exams were still conducted because "The hymen doesn't come back. So we're looking out for the hymen. It doesn't regenerate, so --." Tr. 600; *see also* 607. She admitted that "there's no way you can be certain that Mr. Durham committed the assaults. Tr. 601; *see also* Tr. 607 (Cannot say for certain what caused a perforated hymen).

Lisa Dunson, Defendant's witness who is a certified sexual assault nurse examiner, offered testimony both consistent with and contrary to that of Dr. Abdulkadir. She testified that all hymens have a hole in them, consistent with Dr. Abdulkadir. Tr. 980. She testified

31

that generally there are not injuries with preadolescent children. Tr. 981. She agreed that hymens come in different shapes and sizes. Tr. 981-82. She testified as follows with regard to the term "perforated."

> Q:    Now, what about -- what was the term used on the medical records as far as the hymen; do you recall?
> A.    Yes. They used the word "perforated."
> Q:    And the examiner who conducted -- who viewed the children didn't testify. What in your mind is -- does that mean, "perforated hymen"?
> A.    Truthfully, I don't know. We don't use that term anymore. It hasn't been used since I've been doing exams, which is since 2003. I think when the general population hears the word "perforated," we think of a tear or a hole that's not supposed to be there, so I don't know what that means because I don't use that.
>
> ***
>
> Q:    So "perforated" could mean a tear, it could mean just the natural opening of the hymen. We don't know at this point; is that right?
> A.    I wouldn't speculate what that means.

Tr. 982-83.[19] She testified, contrary to Dr. Abdulkadir, that the hymen tissue can repair itself, Tr. 1003, 1018 unless transected, Tr. 1013, and the science behind the healing time of a hymen is not "down to a science." Tr. 983. She testified that "statistics say that 90 to 95 percent of all children exams, regardless of what the disclosure, are normal." Tr. 985. She also testified that "there usually isn't an injury. Children are usually not injured." Tr. 1002. She testified that an acute injury of the hymen is from blunt force trauma. Tr. 1011.

---

[19] She conceded that the term "perforated hymen" might be very common elsewhere, and that it appears in the Kenyan protocol. Tr. 1007, 1012. She affirmed it was a term once used in the United States. Tr. 1012.

A conviction obtained through the knowing use of false testimony violates due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). To obtain a new trial based on *Napue*, Defendant must establish that: (1) a government witness committed perjury; (2) the prosecution knew the testimony to be false; and (3) the testimony was material. *United States v. Garcia*, 793 F.3d 1194 (10th Cir. 2015).

> A defendant may have a *Brady* claim if the witness unintentionally gave false testimony or the prosecution did not correct testimony that it should have known was false. *See Smith*, 50 F.3d at 831. But this court has repeatedly spoken of *Napue* claims **as requiring perjury by the witness**, *see, e.g., United States v. Crockett*, 435 F.3d 1305, 1316–17 (10th Cir.2006); *Tapia v. Tansy*, 926 F.2d 1554, 1563 (10th Cir.1991); *McBride v. United States*, 446 F.2d 229, 230 (10th Cir.1971), and the prosecutor's knowledge of the falsity, see *Crockett*, 435 F.3d at 1317; *Caballero*, 277 F.3d at 1243; *Smith*, 50 F.3d at 831 (failure of detective to convey information to prosecutor precluded Napue claim, but Brady claim survives). A prosecutor's knowing use of perjured testimony is misconduct that goes beyond the denial of a fair trial, which is the focus of Brady. It is misconduct that undermines fundamental expectations for a "just" criminal-justice system. As the Supreme Court expressed the point, "[T]he knowing use of perjured testimony ... involves a corruption of the truth-seeking function of the trial process." *Bagley*, 473 U.S. at 680, 105 S.Ct. 3375 (internal quotation marks omitted); accord Smith, 50 F.3d at 826 n. 38 (explaining difference between materiality standards under *Napue* and *Brady*).

*Id.* at 1206-07 (emphasis added).

Defendant fails with regard to his *Napue* claim, because he fails to establish that Dr. Alawiya Abdulkadir Mohamed committed perjury. "Perjury is defined as testimony 'given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory.'" *United States v. McNair*, 605 F.3d 1152, 1208 (11th Cir. 2010) *(quoting United States v. Ellisor*, 522 F.3d 1255, 1277 n. 34 (11th Cir.2008)). Defendant lacks

evidence that Dr. Mohamed presented perjured testimony rather than testimony inconsistent with Ms. Dunson and the statement written by Dr. Brown.[20] In his reply brief Defendant acknowledges a lack of knowledge of perjury by Dr. Abdulkadir. Doc. No. 428, p. 5 ("It may also be true that Dr. Abdulkadir Mohamed believed her testimony was accurate, but it is clear that her testimony was nevertheless false.").[21]

The second argument in Defendant's Supplement to his Motion for New Trial arises under *Brady*. *Brady* applies to evidence affecting witness credibility, *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

> There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999).

Defendant contends that the information conveyed to Mr. Gifford by Dr. Brown was exculpatory evidence the government was required to provide to Defendant, to include impeachment evidence against Dr. Abdulkadir.[22] The government responds by arguing that

---

[20] The language of Dr. Brown's statement is not as specific as the testimony of Ms. Dunson, but their statements are consistent.

[21] Defendant presses a second part of a *Napue* claim, arguing that "the records Dr. Mohamed relied for her testimony on and claimed were accurate were almost certainly unreliable." Doc. No. 420, p. 9. This argument, however, does not support a finding of perjury by Dr. Mohamed and therefore does not support a claim under *Napue*.

[22] The Court finds that the evidence was impeaching, but not exculpatory, in light of Dr. Brown's statement that the absence of trauma to the genitals did not equate to the absence of sexual abuse. Similarly,

(continued...)

the evidence was neither suppressed nor material, and therefore Defendant is not entitled to relief under *Brady*. The government's argument is premised on the fact that the evidence about which Defendant complains was otherwise available to him and was the subject of the testimony by Defendant's expert.

The Court disagrees with the government's contention that the statements allegedly made by Dr. Brown to Mr. Gifford were otherwise available to Defendant. The substance of those statements was clearly available from other sources, however, the fact that Dr. Brown had made those statement was not. The Court finds, however, that in light of the testimony presented by Ms. Dunson, the Court cannot conclude that the government's failure to apprise Defendant of Dr. Brown's statements deprived Mr. Durham of a fair trial. A "reasonable probability" of a different result is a shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S., at 678, 105 S.Ct., at 3381. In light of Ms. Dunson's vigorous opposition to Dr. Abdulkadir's testimony, the Court's confidence in the outcome of the trial is not undermined.

Finally, Defendant contends cumulative error entitles him to a new trial. When several errors have been found to be harmless on an individual level, the Court then conducts a cumulative error analysis. *See United States v. Schuler*, 458 F .3d 1148, 1156 (10th Cir.2006). This requires the Court to consider the cumulative effect of the errors on the outcome of the trial to determine whether they were prejudicial. While the trial was not

[22](...continued)
Dr. Abdulkadir testified that she could not identify any person who sexually assaulted the girls.

perfect, any errors considered singularly or cumulative, were, in light of the evidence presented, harmless.

Defendant requested an evidentiary hearing with regard to two propositions in his motion and his supplement.

> "[A] district court is not required to hold an evidentiary hearing before resolving a motion for a new trial, particularly when the record is complete or the petitioner raised only legal claims that can be resolved without the taking of additional evidence." *United States v. Velarde*, 485 F.3d 553, 559 (10th Cir.2007) (citations and quotations omitted). The district court is required to conduct an evidentiary hearing "only if the admissible evidence presented by petitioner, if accepted as true, would warrant relief as a matter of law." *Id*. at 560.

*United States v. Wilkinson*, 526 Fed.Appx. 874, 879 (10th Cir. 2013). The Court concludes that Defendant has not presented admissible evidence that if accepted as true would warrant relief, and thus an evidentiary hearing is not required and would not assist the Court in resolution of the instant motion.

For the reasons set forth herein, Defendant's Motion for New Trial is DENIED.

IT IS SO ORDERED this 26th day of January, 2016.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE